SIMON GOLDVEKHT,

      Plaintiff,          MEMORANDUM
 -against-               AND ORDER
                      09-CV-794 (JG)(LB)

MS. LINDA ALHONOTE, PRINCIPAL of P.S.
254; N.Y.C. DEPARTMENT OF EDUCATION,

      Defendants.
-----------------------------------------------------------------X

A P P E A R A N C E S:

  SIMON GOLDVEKHT
    3029 Brighton 12th St., Apt. D-7
    Brooklyn, NY 11235
    Plaintiff, *Pro Se*

  MICHAEL A. CARDOZO
    Corporation Counsel of the
    City of New York
    100 Church St. 2-140
    New York, NY 10007
  By: Courtney B. Stein
    Mario Frangiose
    *Attorneys for Defendants*

JOHN GLEESON, United States District Judge:

  Simon Goldvekht brings this *pro se* action under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination and Employment Act of 1967 ("ADEA") alleging that Linda Alhonote, the principal of Public School 254 ("P.S. 254") in Brooklyn, and the Board of Education of the City School District of the City of New York ("Board") discriminated against him because of his age and his national origin. For the reasons stated below, defendants' motion to dismiss is granted in part and denied in part.

## BACKGROUND

  Goldvekht, who was born on March 4, 1950, is a Jewish immigrant from the

former Soviet Union. He works as a paraprofessional at P.S. 254. On February 13, 2009, Goldvekht filed a form complaint, supplemented by numerous attachments.

The documents attached to the form complaint describe an incident involving Goldvekht and a student[1] that occurred on April 7, 2006. The student claimed that Goldvekht physically abused her by pulling her arm in an attempt to take her to Mr. St. Mark, a school counselor, following an incident of disruptive behavior in class. Two other adults, a Mr. Weinstein and a Ms. LoSquadro, were present in the room when this incident occurred. On April 12, 2006, Goldvekht, accompanied by his union representative, met with principal Linda Alhonote to discuss the incident. In a written statement dated April 15, 2006, Goldvekht claimed that the complaining student and another student who witnessed the incident had submitted false statements, and that a third student had been coached into making false statements by the complaining student. Alhonote then drafted a disciplinary letter, dated April 28, 2006, concluding that Goldvekht had pulled the student's arm in violation of Chancellor's Regulation A-420. On May 18, 2006, Goldvekht signed a copy of the letter indicating that he had received it and understood that a copy would be placed in his file.

Following this incident, Goldvekht sent three letters to Randi Weingarten, the president of the United Federation of Teachers ("UFT"), Goldvekht's union. He complained that Alhonote's decision was biased and failed to consider Goldvekht's account of the incident and

---

[1] Pursuant to the E-Government Act of 2002, Pub. L. No. 107-347 (as amended August 2, 2004) and Adminstrative Order 2004-09, parties are required to refrain from including, or must partially redact where inclusion is necessary, certain personal data identifiers from all pleadings filed with the court, including exhibits thereto, whether filed electronically or in hard copy, unless otherwise ordered by the Court. Specifically, if the involvement of a minor child must be mentioned, only the initials of that child shall be used.
  Similarly, statements by two student witnesses regarding the incident were provided to Goldvekht upon his request, and on April 12, 2006, he signed an agreement that he understood "that he was prohibited from disclosing the identity of the writer and the substance of the statement" to anyone "besides his attorney or his union representative." April 24, 2009 Submission of Simon Goldvekht at 15. However, Goldvekht has filed unredacted copies of those statements and letters discussing them in two suits in this court, and apparently also mailed them to, *inter alia*, the New York Times, the New York Post, and President George W. Bush.

requesting that UFT investigate the incident. When he personally delivered the third letter to her office, he was told to contact UFT's District 22 Representative, Fred Gross. Goldvekht says that he met with Gross on June 28 and was told that UFT would not investigate the incident because Goldvekht had not lost his job as a result of it. Goldvekht opined that Alhonote had a "biased opinion" of him and his performance, as indicated by the June 2006 End Term Evaluation he attached to his letter. Compl. 100.[2] In this evaluation, Alhonote described Goldvekht's attendance and punctuality as merely satisfactory, and his performance in all other categories, as well as his overall performance, as "good." Compl. 10. Goldvekht signed the evaluation on June 26, 2006, but wrote that he disagreed with it, specifically noting that he took only one personal day during the 2005-2006 school year and had never been late.

On October 15, 2006, Goldvekht again wrote to Gross, this time to file "an official grievance" against Alhonote for her handling of the April 7 incident and to demand that Alhonote remove the disciplinary letter from her file. Compl. 102. He alleged that Alhonote threatened him "with termination of employment on numerous occasions for proceeding with this matter." *Id.* at 103.

In December 2007, Goldvekht wrote to the Equal Employment Opportunity Commission ("EEOC"), stating that Alhonote "holds a biased opinion" of Goldvekht and his performance. *Id*. at 66. When he complained to her that the disciplinary letter had prevented him from getting a job elsewhere,

> she openly stated that the reason I would not get a job elsewhere was not my record, but rather my Jewish-Russian accent. Prior to this statement, principal Alhonote on a number of occasions has made fun of, and some derogatory remarks regarding my accent, although she appears to have no problem with teachers with Asian, German, Australian, and British accents in their English

---

Goldvekht is advised to make the appropriate redactions in any future filings.

[2] For ease of reference, I cite to the complaint and its attached exhibits using the pagination established by the Court's electronic filing system.

pronunciation.

*Id.*

Also attached to Goldvekht's complaint is an EEOC charge form dated January 28, 2008. It names both Alhonote and UFT as the parties who discriminated against him, and indicates age and national origin as the bases for discrimination. It lists April 9, 2006 as the earliest date of discrimination and November 5, 2007 as the latest date, and indicates that the discrimination is ongoing.

In a February 23, 2008 letter to Spencer H. Lewis, Jr. of the EEOC, Goldvekht detailed the problems he had finding better employment following the disciplinary action. At an unspecified time in 2006, Goldvekht interviewed for a music teacher position at P.S. 225 in Brooklyn. After two interviews, Principal Montebello offered Goldvekht a part-time position until the end of the school year and a full-time position when the new school year began. Goldvekht declined the former position, stating that he did not wish to disrupt his current students' work, and Montebello told him to come to the school on August 29, 2006 to make arrangements regarding the full-time position. When Goldvekht arrived in August, Montebello was "unsmiling and distant, and curtly informed [Goldvekht] that he hired someone else" for the position. Compl. 82.

When Alhonote asked Goldvekht about the meeting, he told her he believed he had lost the position because of the letter in his file, and Alhonote opined that he was turned down because of his "Russian-Jewish accent." *Id.* When Goldvekht informed her that the past and current teachers at P.S. 225 were also Russian immigrants, "Ms. Alhonote replied with a silent sneer and walked off." *Id.* at 83.

In the February 23, 2008 letter to the EEOC, Goldvekht also describes three other

unsuccessful attempts to secure employment. Although Goldvekht does not mention specific dates, it appears (and Goldvekht confirmed as much at oral argument) that these incidents also occurred in 2006. Specifically, Goldvekht says he "next" gave his resume to a principal's administrative assistant at P.S. 253. *Id.* at 83. After being told his name, she said the principal was too busy to meet with him. The principal then entered the room, asked the assistant who the visitor was, and, after a whispered conversation with the assistant, curtly told Goldvekht she was too busy to meet with him.

Goldvekht's "next interview" was with the principal and assistant principal at Intermediate School ("I.S.") 228 for a full-time music teacher position. *Id.* After an apparently favorable interview with the principal and an assistant principal, the principal asked for Goldvekht's file number and checked his record on the computer. He then told Goldvekht that they only had a part-time position available, which Goldvekht declined.

At some point, Goldvekht also received an unsolicited invitation to interview for a music teacher position at Middle School ("M.S.") 442. When Goldvekht arrived for the interview, "the principal looked and acted hesitant" and asked whether he would be able to get a recommendation letter from Ms. Alhonote. *Id.* Goldvekht replied affirmatively, but was told they only had a temporary position available.

Goldvekht also applied for a position at I.S. 206. He alleges that Alhonote "advised her friend, Gemma Carletto, principal of I.S. 206," not to interview Goldvekht. *Id.* Carletto told one I.S. 206 teacher that she would not interview Goldvekht because he had a bad recommendation from Alhonote. Another I.S. 206 teacher told Goldvekht that the unfavorable recommendation from Alhonote made it unlikely that he would find full-time work at I.S. 206 or any other school in Brooklyn. In an affidavit submitted with his opposition papers, Goldvekht

5

further alleges that he was twice passed up for a music teacher position at P.S. 254 in 2009, and that one of the positions went to a woman with "no music experience" and the other went to a "less-experienced and less-qualified teacher." June 5, 2009 Aff. of Simon Goldvekht 2.

In his February 23, 2008 letter to the EEOC, Goldvekht also alleges that Alhonote "continued to do what she could to undermine [his] work with students and [his] influence in the educational decision-making process at P.S. 254." Compl. 84. Specifically, he discusses an incident involving a special-needs student with a learning disability with whom Goldvekht had worked for more than two years. Goldvekht was not invited to a November 29, 2007 meeting with this student's parents to discuss the student's future at the school. Goldvekht alleges that Alhonote wanted the student removed from the school's special education program because he was a Russian Jew ("the only one in this program"), Compl. 84, and attempted to have him removed on the pretext that he was making insufficient progress. This student's mother said that she would leave the meeting if Goldvekht did not attend, and Alhonote falsely told her that he was too busy to attend. The student's parents "walked out" of the November meeting. *Id.* Another meeting was scheduled for February 13, 2008. Goldvekht attended and stated that the student's progress was comparable to that of other children in the program.

The student in question apparently remained at P.S. 254, as he is also implicated in an incident Goldkvekht describes in a June 10, 2008 letter to the EEOC. During the spring of 2008, Goldvekht worked as a paraprofessional for this student in the fourth-grade classroom of Ms. Mascioli. He alleges that during "the past few months," Alhonote "habitually" entered Mascioli's classroom and spoke with her privately. Compl. 52. "Beginning in early May, [Goldvekht] began noticing striking and disturbing changes in Ms. Mascioli's attitude toward [him]." *Id.* She began to correct Goldvekht's pronunciation in class, told him not to instruct this

6

student in fourth grade math, and "loudly" criticized him for disobeying this instruction. After a meeting with Mascioli, Assistant Principal Moser, and Goldvekht's union representative, Mascioli "grudgingly apologized" for her conduct. *Id.* at 53.

In a March 22, 2008 letter to the EEOC, Goldvekht stated that "a couple of months ago," Alhonote called him into her office and asked him to return a key to the school elevator because he was no longer working with disabled students. He protested that he had foot pain and that other staff members who did not work with disabled students were permitted elevator keys. Goldvekht was later diagnosed with a foot fracture and given a note by his doctor requesting that he be allowed to use the elevator. Compl. 80.

Goldvekht alleges that Alhonote tried to impede the UFT investigation into the disciplinary action by making herself and other witnesses unavailable when union investigators visited the school. On January 22, 2008, at around 1:30 P.M., Goldvekht overheard Weinstein telling Alhonote, via telephone, that he told St. Mark to rewrite statements. And 25 minutes later, Weinstein spent three minutes talking to LoSquadro, then went to Room 335 with some statements. Shortly afterward, St. Mark walked out of Room 335 "with what looked like the printouts of the statements." Compl. 85. Goldvekht also alleges that nine people made statements pertaining to the April 7, 2006 incident, but Goldvekht's requests to receive statements made by St. Mark and LoSquadro were "repeatedly denied." *Id.*

On April 1, 2008, Goldvekht and his union representative, Eva Dilfanian, met with Alhonote. Goldvekht showed Alhonote a magazine article stating that every UFT member has a right to examine and copy his official file, and asked her to allow him to review and copy the file. The file that was produced contained no statements concerning the April 7, 2006 incident in which Goldvekht allegedly pulled a student's arm. Alhonote said "she had no idea

7

where the statements could have gone," and she refused to write an explanatory letter on the matter. Compl. 68. Dilfanian allegedly prepared a statement involving this incident, but it is not attached to Goldvekht's complaint.

DISCUSSION

A.  *Motion to Dismiss*

Motions to dismiss pursuant to Rule 12(b)(6) test the legal, not the factual, sufficiency of a complaint. *See, e.g.*, *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000) ("At the Rule 12(b)(6) stage, '[t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.'" (quoting *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998))). Accordingly, I must accept the factual allegations in the complaint as true, *Erickson v. Pardus*, 551 U.S. 89, ---, 127 S. Ct. 2197, 2200 (2007) (*per curiam*), and draw all reasonable inferences in favor of the plaintiff. *Bolt Elec., Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir. 1995). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

In its recent decision in *Iqbal*, the Supreme Court offered district courts additional guidance regarding the consideration of motions to dismiss under Rule 12(b)(6). Citing its earlier decision in *Twombly*, 550 U.S. 544, the Court explained:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.

129 S. Ct. at 1949 (internal citations and quotation marks omitted).

B.  *Goldvekht's Federal Claims*

1. *Hostile Work Environment*

Goldvekht filed his discrimination charge with the EEOC on January 28, 2008. As a result, defendants argue, any allegedly discriminatory act that occurred prior to April, 3, 2007, is time barred because an administrative complaint must be filed within 300 days of any allegedly discriminatory conduct. Although the timely filing of a discrimination charge is not a jurisdictional requirement and is subject to estoppel and equitable tolling, *Zipes v. Trans World Airlines, Inc.*, 45 U.S. 385, 393 (1982), a mere lack of wherewithal or legal sophistication does not constitute sufficient grounds for equitable tolling. *See South v. Saab Cars USA, Inc.*, 28 F.3d 9, 11 (2d Cir. 1994) (discussing circumstances in which tolling is appropriate). Accordingly, I conclude that Goldvekht cannot hold defendants liable for individual acts of discrimination that occurred prior to April 3, 2007.

However, Goldvekht also alleges that the defendants violated Title VII by creating a hostile work environment. "[W]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult[] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Amtrak v. Morgan*, 536 U.S. 101, 116 (2002) (internal quotation marks omitted). Thus, to state a hostile work environment claim under Title VII, a plaintiff must allege that harassment created an abusive working environment, and that this harassment was motivated by race, sex, or some other protected status such as national origin. Such a claim is not "time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Id.* at 122.

In this case, Alhonote, who mocked Goldvekht's accent and told him that it was hindering his advancement, is the only actor to whom Goldvekht's pleadings plausibly attribute

9

any discriminatory bias. Between April 2006 and January 2008, Goldvekht alleges only that Alhonote placed an undeserved disciplinary letter in his file, repeatedly refused to remove it, told a colleague not to hire Goldvekht, and did not invite Goldvekht to participate in a November 2007 meeting with the parents of a student with whom Goldvekht had worked. He does not allege that any other teacher of Russian-Jewish origin was mistreated during this period, or that any other manager or employee of P.S. 254 made any disparaging comments about his national origins. Defendants argue that a single act of discrimination -- the letter in the file -- does not transform into a hostile work environment claim simply because Goldvekht repeatedly and unsuccessfully complained about it. I agree. The mistreatment Goldvekht alleges, even if proven, would not be sufficiently severe or abusive to constitute a hostile work environment claim. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) ("[T]he plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment." (internal quotation marks omitted). Accordingly, his Title VII hostile work environment claim is dismissed.

Moreover, nothing in the complaint suggests that Alhonote harassed Goldvekht because of his age. Accordingly, Goldvekht has failed to state a hostile work environment claim under the ADEA.

2. *Retaliation Claims*

To the extent Goldvekht alleges that Alhonote discriminated against him prior to April 2007 because he engaged in conduct protected by Title VII or the ADEA, his complaints are time-barred, as discussed above. Furthermore, to the extent Alhonote threatened to fire Goldvekht or sought to prevent the principal from P.S. 225 from hiring him because he sought

help from his union, her conduct might constitute an unfair labor practice under the National Labor Relations Act, but an employee must seek redress for such conduct by filing a charge with the National Labor Relations Board within sixth months of the conduct. 29 U.S.C. § 160.

However, Goldvekht also argues that he was passed over for promotions in 2009 after filing this suit. In effect, Goldvekht seeks to amend his complaint to include instances of retaliation occurring after his complaint in this case was filed.

"To establish a prima facie case of retaliation, an employee must show [1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998) (internal quotation marks omitted).

With respect to the 2009 failure to promote, defendants concede that Goldvekht properly pleads all three elements. Similarly, such a claim is obviously "reasonably related" to Goldvekht's 2008 EEOC charge, as the protected activity is a lawsuit following the resolution of that charge and the issuance of a right-to-sue letter. Accordingly, I construe Goldvekht's complaint as amended to allege that these two failures to promote constitute retaliation in violation of Title VII, and decline to dismiss them as unexhausted or time-barred.

C.   *State Law Claims and Alhonote's Individual Liability*

Under Title VII, the Board is Goldvekht's employer, and Alhonote is an agent of his employer. The Second Circuit has held "that an employer's agent may not be held individually liable under Title VII." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995), abrogated on other grounds by *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998). Accordingly, Goldvekht's Title VII claims against Alhonote must be dismissed.

As a general matter, however, conduct that constitutes retaliation under Title VII is also actionable under New York State Human Rights Law (N.Y. Exec. L. § 296(1)(a)) and Section 8-107 of the New York City Administrative Code. *Espaillat v. Breli Originals, Inc.*, 642 N.Y.S.2d 875, 877 (1st Dep't 1996). Although defendants did not construe Goldvekht's complaint to raise state and municipal law claims, they conceded at oral argument that it is reasonable to do so and that the legal standards for substantive liability are functionally identical.

Furthermore, in *Tomka*, the Second Circuit held that "a defendant who actually participates in the conduct giving rise to a discrimination claim may be held personally liable under" N.Y. Exec. L. § 296(6). 66 F.3d at 1317. The same reasoning applies to Section 8-107 of the New York City Administrative Code. Accordingly, provided that Goldvekht is entitled to sue under N.Y. Exec. L. § 297, his state and municipal law retaliation claims against Alhonote may proceed.

## CONCLUSION

For the foregoing reasons, the motion to dismiss is granted. However, based on Goldvekht's June 5, 2009 affidavit, I deem his claim amended to allege retaliation claims based on the 2009 failures to promote (1) against the Board under federal, state, and local employment discrimination law and (2) against Alhonote under state and local employment discrimination law. The defendants may move against this new claim as they would against any amended complaint.

So ordered.

John Gleeson, U.S.D.J.

Dated: September 1, 2009
       Brooklyn, New York